**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| PATRICK BEDFORD AND EACH | § | |
| OF THE INDIVIDUALS LISTED | § | |
| ON EXHIBIT A, | § | |
| Plaintiffs, | § | |
| VS. | § | |
| | § | C.A. No. _____ |
| BP p.l.c.; BP EXPLORATION AND | § | |
| PRODUCTION, INC.; BP AMERICA | § | |
| PRODUCTION COMPANY; TRANSOCEAN | § | **JURY TRIAL DEMANDED** |
| LTD.; TRANSOCEAN HOLDINGS, LLC; | § | |
| TRANSOCEAN OFFSHORE DEEPWATER | § | |
| DRILLING, INC.; TRANSOCEAN | § | |
| DEEPWATER, INC.; TRITON ASSET | § | |
| LEASING GmbH; ANADARKO | § | |
| PETROLEUM CORPORATION CO.; | § | |
| ANADARKO E&P COMPANY LP and | § | |
| MOEX OFFSHORE 2007 LLC | § | |
| | § | |
| Defendants | § | |

**COMPLAINT**

Plaintiff Patrick Bedford, and all individuals named in Exhibit A attached hereto, file this Complaint against Defendants BP p.l.c. ("BP p.l.c."), BP EXPLORATION AND PRODUCTION, INC. ("BP Exploration"), BP AMERICA PRODUCTION COMPANY ("BP America"), TRANSOCEAN LTD. ("Transocean Ltd."), TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore"), TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), TRITON ASSET LEASING GmbH ("Triton"), ANADARKO PETROLEUM CORPORATION CO. ("Anadarko"), ANADARKO E&P COMPANY LP ("Anadarko E&P") and MOEX

1

OFFSHORE 2007 LLC ("MOEX Offshore"). BP Exploration, BP America, and BP p.l.c. are collectively referred to herein as "BP." Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are collectively referred to herein as "Transocean." Defendants Anadarko and Anadarko E&P are collectively referred to herein as the "Anadarko Defendants."

## INTRODUCTION

On April 20, 2010, a well blowout on the vessel Deepwater Horizon ("Deepwater Horizon") in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The blowout and subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions that damaged, depleted and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, including those along the Gulf coast areas of Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill"). Although the blown out well is now capped, the disastrous environmental and economic effects of the Spill are widespread and will likely remain so for decades.

Each day during the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser. Some of that oil found its way to the surface and formed a visible oil slick, while other oil spread out below the water's surface. At times, the surface oil slick covered tens of thousands of square miles, spreading towards and along the coastlines of the Gulf coast states. The oil that stayed below the surface – combined with chemical dispersants – worked its way through the entire water column and came to rest on the seafloor at many different depths, damaging ecosystems throughout the Gulf of Mexico. Both the surface and subsurface oil, and the chemical dispersants used to break up spilled oil, damaged marine

life in the Gulf of Mexico itself (the "Gulf of Mexico"), as well as in salt water bays, estuaries, other types of inlets and other bodies of water that extend to or mix with the Gulf of Mexico along the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida ("Coastal Zone").

BP, Transocean, the Anadarko Defendants and MOEX Offshore could have prevented this catastrophe by (1) using the best deep water drilling practices then available, (2) following required safety protocols and precautionary procedures, (3) properly maintaining equipment, and (4) using widely available emergency safety technology. But, with little regard for safety and the risk to the environment, BP, Transocean, the Anadarko Defendants and MOEX Offshore chose to repeatedly ignore critical and widely accepted operational disciplines to save money and time. BP's and Transocean's cost-cutting measures are properly described as outrageous – consistent with their long corporate histories of flagrant disregard for safety – and taken with willful, wanton, and reckless indifference to the disastrous results to the environment and Plaintiffs.

The Spill caused, and continues to cause, devastating environmental and economic damage. For example, thousands of square miles of waters were closed to fishing, swimming and/or boating, and thousands of square miles of coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches were compromised. Fishermen and others, who then relied on and continue to rely on seafood from the Gulf of Mexico for subsistence, have – throughout the Gulf Coast – suffered losses and damages.

Plaintiffs bring this action to recover for subsistence losses pursuant to the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2719 (the "OPA.") and other damages arising out of the Spill. Plaintiffs are individuals who harvest fish, shrimp, crabs, oysters and other natural resources from the Gulf of Mexico for personal consumption, for consumption by their families

and friends, for gifts to and for the subsistence of others and, in some cases, for bartering. Some of the Plaintiffs are also recreational boaters, divers, swimmers and snorkelers that lost the use and enjoyment of the Gulf of Mexico waters as a result of the Deepwater Horizon Oil Spill.

Both BP Exploration and Transocean Holdings have been determined to be "responsible parties" under the OPA by the United States Coast Guard. Anadarko was designated as a "responsible party" under the OPA by the United States District Court for the Eastern District of Louisiana on February 22, 2012. Therefore, defendants BP Exploration, Transocean Holdings and Anadarko, if not all defendants, are strictly liable for Plaintiffs' damages. Moreover, the OPA liability limits do not apply to this lawsuit because, among other reasons: (1) Plaintiffs' damages were proximately caused by the gross negligence or willful misconduct of defendants, (2) Plaintiffs' damages were proximately caused by defendants' violation of an applicable Federal safety, construction, or operation regulation, and (3) BP failed to accurately or timely report the incident or provide reasonable, timely and accurate cooperation and assistance.

This Complaint does not constitute a waiver of Plaintiffs' rights to add or assert, or seek leave to add or assert, additional claims, or name additional party defendants, depending on further information learned through discovery or investigation.

Plaintiffs believe that this action is subject to the August 10, 2010 order of the Multi-district Litigation Panel (the "MDL Panel") which transfers actions such as this on to the United States District Court for the Eastern District of Louisiana. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 731 F. Supp. 2d 1352, 2010 WL 3166434 (JPML, August 10, 2010) (the "Transfer Order").

## **PARTIES**

Plaintiff Patrick Bedford is an adult resident citizen of Texas.  At the time of the Spill, Plaintiff regularly harvested natural resources for subsistence from the Gulf of Mexico off the shore of the State of Texas, as well as salt water bodies that connect to the Gulf of Mexico that were also affected by the Spill.  The Plaintiffs listed in Exhibit A reside in Alabama, Florida, Louisiana, Mississippi or Texas.  Each of the Plaintiffs regularly harvested natural resources for subsistence from (1) the Gulf of Mexico, (2) in and around the Coastal Zone and/or (3) other salt water bodies that connect to the Gulf of Mexico that were also affected by the Spill.

Defendant BP p.l.c. is a publicly traded company, incorporated under the laws of England and Wales. BP common shares are listed on the London Stock Exchange and BP American Depository Shares are listed on the New York Stock Exchange.  Investors in the U.S. own about 40% of BP's outstanding common stock (as do investors in the U.K., with the remainder spread out in other countries).  BP files consolidated financial statements which include BP's operating subsidiaries.  BP's largest operations, through its wholly-owned and controlled operating subsidiary BP America, Inc. ("BP America"), are in the U.S.  During the past ten years, BP's Board had at least fourteen meetings in the U.S.  BP is the largest oil and gas producer in the U.S. and the nation's second largest gasoline retailer (through 11,500 service stations throughout the U.S.).  BP has approximately 23,000 employees in the U.S., with the majority located in Texas. Defendant BP p.l.c. has done and is doing business in the State of Texas, and throughout the United States.  Defendant BP p.l.c. does business in this judicial district, directly and/or indirectly. Defendant BP p.l.c. maintains a corporate office in the United States at 501 Westlake Park Boulevard in Houston, Texas.  Defendant BP p.l.c., may be served with citation by serving any of its directors or officers, at 1 St. James's Square, London, United Kingdom SW1 4PD.

Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") – which is now known as the Bureau of Ocean Energy Management – allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo," where the Deepwater Horizon Oil Spill originated.  BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Texas, does business in Texas and has a registered agent in Texas.  BP Exploration can be served process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201-4234.

Defendant BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas.     BP America was a party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This court has personal jurisdiction over BP America, because BP America is registered to do business in Texas, does business in Texas and has a registered agent in Texas.  BP America can be served process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201-4234.

BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals  for well operations, and retaining and overseeing the contractors working on  the various aspects of the well and the drilling operations.

Defendant Transocean Ltd. is a Swiss Corporation.  Defendant Transocean Ltd. is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect where the Oil Spill originated.  This Defendant has done and is doing business in the State of Texas and throughout the United States. This Defendant does business in this judicial district, directly and/or indirectly.  Defendant Transocean Ltd. may be served with citation by serving any of its officers or directors at 4 Greenway Plaza, Houston, Texas 77046.

Defendant Transocean Holdings, LLC is a Delaware corporation with its principal place of business in Houston, Texas.  Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Deepwater Horizon Oil Spill originated.  Indeed, Transocean Holdings is a party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon. Transocean Holdings does business in Texas and can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, TX 78701.

Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.  This court has personal jurisdiction over Transocean Offshore, because Transocean Offshore is registered to do business in Texas, does business in Texas and has a registered agent in Texas.  Transocean Offshore can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, TX 78701

Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  At all pertinent times, Transocean Deepwater was doing business in the State of Louisiana and within this district.  This court has personal jurisdiction over Transocean Deepwater, because Transocean Deepwater is registered to do business in Texas, does business in Texas and has a registered agent in Texas.  Transocean Deepwater can be served process by serving its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, TX 78701

Defendant Triton Asset Leasing GmbH is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect where the Oil Spill originated.  Triton has done and is doing business in the State of Texas and throughout the United States.  Triton does business in this judicial district, directly and/or indirectly.  Triton may be served with citation by serving any of its officers or directors at Turmstrasse 30, Zug, 6300, Switzerland.

Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it.  At all times relevant to the Spill, Transocean – subject to BP's inspection and approval – was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities, at all times relevant to the Spill.

Defendant Anadarko Petroleum Corporation Co. is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Texas. Anadarko is an oil and gas exploration and production company. At all relevant times, Anadarko was a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), and held a 2.5% ownership interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over Anadarko, because Anadarko is registered to do business in Texas, does business in Texas and has a registered agent in Texas. Anadarko can be served process by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, TX 75201-4234.

Defendant Anadarko E&P Company LP is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Texas. Anadarko E&P is an oil and gas exploration and production company. At all relevant times, Anadarko E&P was a party to the Operating Agreement, and held a 22.5% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over Anadarko E&P, because Anadarko E&P is registered to do business in Texas, does business in Texas and has a registered agent in Texas. Anadarko E&P can be served process by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, TX 75201-4234.

Defendants Anadarko and Anadarko E&P are collectively referred to herein as the "Anadarko Defendants."

Defendant MOEX Offshore 2007 LLC is a Delaware corporation with its principal place of business in Houston, Texas. At all relevant times, MOEX Offshore was a party to the

Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico. This court has personal jurisdiction over MOEX Offshore, because MOEX Offshore is registered to do business in Texas, does business in Texas and has a registered agent in Texas. MOEX Offshore can be served process by serving its registered agent, Naoki Ishii, 9 Greenway Plaza, Suite 1220, Houston, TX 77046.

## JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

Venue in this Court is proper under the Oil Pollution Act, 33 U.S.C. § 1017(b). Venue in this Court is also proper under 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A. The Overview

On April 20, 2010, highly pressurized hydrocarbons leaked into the Deepwater Horizon subsea oil well. The Deepwater Horizon's emergency equipment failed to stop the oil and gas from blowing out of the well. The blow out caused an explosion that led to a fire and the eventual sinking of the Deepwater Horizon vessel. A massive oil spill resulted that has damaged Plaintiffs.

The blowout was due, in part, to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons. The numerous indications that hydrocarbons were leaking into the well were apparently misinterpreted or overlooked by Deepwater Horizon workers for a significant period of time prior to the blowout. Once the hydrocarbons reached the vessel's deck, the fire and gas prevention and alarm systems on the

Deepwater Horizon failed to warn the crew and prevent a fire. The Deepwater Horizon's blow out preventer ("BOP") also failed to seal the well and stop the flow of hydrocarbons exacerbating the disaster.

Millions of barrels of oil and gas leaked into the Gulf of Mexico from the damaged well over the following three months doing immense and long-lasting damage to the environment in and around the Gulf of Mexico, and to the Plaintiffs. Meanwhile, BP downplayed the severity of the Spill. BP was unprepared for the massive clean-up effort required.

### B. How Deepwater Offshore Drilling Works

Deepwater offshore drilling for oil and natural gas is a complex, technical process. The first challenge is to find geological formations that likely contain trapped hydrocarbons. Once a promising trap is located, drilling vessels such as the Deepwater Horizon are positioned on the sea surface to drill an exploratory well. If the exploratory well successfully taps into a worthwhile source of hydrocarbons, the drilling vessel is transformed into a production well that will extract oil or gas from the trap. Before a production well is set up, successful exploratory wells are sometimes sealed with cement and temporarily abandoned in a fashion that allows them to be reopened by a production vessel at a later date when the well owner is ready to begin extracting hydrocarbons for production. At the time of the April 20, 2010 blowout, the Deepwater Horizon crew was in the process of preparing the Macondo well for temporary abandonment.

An exploratory well begins with a pilot hole drilled into the seabed. The pilot hole is then lined with pipe or "cased." The first section of casing pipe lowered into the pilot hole anchors a safety device known as a blowout preventer ("BOP"). The BOP is an assembly of hydraulically-operated rams that can be used to partially or totally seal the well during both

11

routine drilling activities and well control emergencies.  For example, the BOP can prevent a "kick" – which is a small leak of hydrocarbons into the well – from escalating into an uncontrolled release of hydrocarbons into the surrounding environment.  The BOP can be activated manually from the drilling vessel, or automatically through an automatic mode function ("AMF") known as a "deadman switch."  The deadman switch closes the BOP's most secure rams when both the electrical and hydraulic connections from the drilling vessel are severed.

A blowout risk is one of the most dangerous and common deep water drilling risks.  The reservoirs of hydrocarbons trapped in the rock formations beneath the sea floor are often highly pressurized, and managing the pressures is a vital task during drilling operations.  Proper well monitoring typically catches small hydrocarbon influxes early, so a kick can be contained and a leak repaired before well control is jeopardized.

Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well.  A pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

As the drilling apparatus moves downward drilling out the well bore hole, drilling fluid called "mud" is pumped down the center of the drill pipe.  Drilling mud is a thick mixture of barite, water, clay, and chemicals that cools and lubricates the drill bit and suspends and carries rock fragments and other drilling debris to the surface as the mud circulates.

Drilling mud is carefully formulated so that its hydrostatic pressure slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process.    The weight of the mud pushes back against the pressure of the

hydrocarbons in those formations helping to control against the ever-present risk of kicks and blowouts in the well.

As the well bore is drilled, additional sections of casing are added to line each newly-drilled open section with pipe.  Each casing section is secured with a cement plug. When temporary well abandonment is planned, a contractor seals the well off before the drilling reaches the hydrocarbon reservoir to isolate the oil and gas and to prevent it from leaking into the well.  A cement plug is then placed below the BOP at the top of the well.  The drilling vessel can then disconnect from a stabilized well until a permanent oil production platform is put into place to begin extracting oil or gas.

## C.  The Macondo Lease, BP's Exploration Plan and the Operating Agreement

On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and extract hydrocarbons from the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.  Before BP began operations at the Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") showing that (1) it planned and prepared to conduct its activities in a safe manner, (2) its plan conformed to applicable regulations and sound conservation practices, and (3) it would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

Federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."  30 C.F.R. §§ 250.212, 250.219, 250.227.

Among other things, the EP was required to contain a "blowout scenario," that met the following:

> A scenario for the potential blowout of the proposed well in your EP that you
> expect will have the highest volume of liquid hydrocarbons.  Include the

13

estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's:

worst case discharge scenario (see 30 C.F.R. 254.26(a)), and a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities (see 30 C.F.R. 254.26(b), (c), (d), and (e)).

30 C.F.R. § 250.219.

Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

In February 2009, BP filed its initial EP for the Macondo prospect site with the MMS. In the EP, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." BP predicted that – in the unlikely event that a spill did occur – a worst case discharge scenario of 162,000 gallons of oil per day would occur – an amount it claimed it was prepared to handle. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

In response to these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act. As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical

14

exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill. BP then obtained a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

Once the EP and drilling permits for Macondo were approved, BP entered into the Operating Agreement with the Anadarko Defendants and MOEX Offshore. The Operating Agreement defined the roles and responsibilities of the three joint Lease holders and provided that the Anadarko Defendants and MOEX Offshore were to receive significant information from BP and that the Anadarko Defendants and MOEX Offshore had the right to demand information, meetings and conduct its own inspections of the Deepwater Horizon vessel.

As a condition to acquiring their leasehold interests in the Macondo prospect, the Anadarko Defendants and MOEX Offshore executed BP's well plan and Authorizations for Expenditure (AFEs) for Macondo putting the Anadarko Defendants and MOEX Offshore on notice of: (1) the well location; (2) the anticipated time necessary to conclude the operation; (3) total depth and target zones; (4) the proposed drilling and completion plans, including the casing program and directional details; (5) details of all coring, logging, and other evaluation operations conducted; and (6) information about the drilling rig to be used. The AFEs also informed the Anadarko Defendants and MOEX Offshore about the financial aspects of the well plan.

The Operating Agreement granted the Anadarko Defendants and MOEX Offshore (1) the right to suggest its own proposed well plan for drilling exploratory and appraisal wells within the Macondo prospect, (2) to place their own personnel on key drilling and well development teams, (3) to receive substantial information and data about operations (including

real-time well data) on an ongoing basis, (4) to call meetings with BP and other parties regarding any aspect of the Macondo prospect, and (5) the right of unanimous approval of all press releases regarding the prospect.

Moreover, a November 2009 amendment to the Operating Agreement gave the Anadarko Defendants and MOEX Offshore the right to conduct "health, safety, and environmental inspection[s]" with a "right of access to activities and operations" on the rig, as well as to access BP's files, audits, and statistics on health, safety, and environmental issues.

## D.   The Deepwater Horizon's Poor Safety and Maintenance Record

The Deepwater Horizon – which was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site – was initially put into service in February 2001. Prior to the Spill, BP and Transocean had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.  Also prior to the Spill, BP and Transocean had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies.

## E.   The Troublesome Nature Of The Macondo Well

The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak and brittle rock formations.   At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet. BP knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

BP had already had significant problems with the Macondo well before April 20, 2010. Well before the blowout, BP employees had referred to Macondo as a "crazy," "nightmare" well. At depths almost 3.5 miles below the sea floor, the pressures and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors. In some places the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.

Deepwater Horizon workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress. According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil. The MMS had even warned BP that the gas build-up in this well was a concern and that BP should "exercise caution."

As the drilling schedule fell behind due to these and other problems, BP increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo. The pressure continued even after BP experienced serious problems with the well on March 8, 2010, including a hydrocarbon influx into the well and loss of well control. The hydrocarbons leaking into the well went unnoticed for over 30 minutes, allowing 40 barrels of hydrocarbons to flow into the well before it was shut-in to restore well control. This near miss could have been a lethal blowout.

A BP analysis of the March 8, 2010 near miss deemed the drilling vessel team's 30-plus minute response time to the hydrocarbon influx as too slow. A "lessons learned" document was distributed to BP employees, and both BP and Transocean leaders on the Deepwater Horizon

were given verbal feedback about the handling of the event. Several key individuals who were present during the March 8, 2010 incident were also working on the Deepwater Horizon at the time of the April 20, 2010 blowout.

The damage from the March 8, 2010, incident was so severe that BP and Transocean was forced to abandon the lower part of the well bore, plug it with cement, and begin drilling in a different direction, setting them back several days and $25 million. The delay caused BP and Transocean to intensify their demands that the drilling operations be completed at a dangerously increased pace.

Pursuant to their drilling contract, BP was paying Transocean approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000. At the time of the blowout, drilling at Macondo was months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting BP increasingly over budget. During that period, BP made many decisions about the drilling plan for economic reasons, despite those decisions increasing the risk of the catastrophic failure of the Deepwater Horizon well. Also, during that process, BP repeatedly chose to violate industry guidelines and government regulations, and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well. In their rush to complete the well, BP and Transocean made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

**F.   The Displacement Procedure Was Premature and Nonstandard**

BP and Transocean were so focused on speed that they could not even wait the 72

hours required for the proper setting of the cement job — installed for temporary abandonment — before pressing forward with the mud displacement. Without the heavy drilling mud to counter the reservoir pressure, any hydrocarbon influx into the well could turn dangerous very quickly, with only comparatively light seawater blocking the path up through the well and the riser to the surface.

Transocean officials initially protested BP's mud displacement plan, but Transocean never exercised its right to stop work on the well. Instead, Transocean acquiesced to BP's desire to rush the mud displacement at Macondo.

On the morning of April 20, 2010, the day of the blowout, BP informed M-I, LLC's ("M-I") drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet.

Lindner calculated the atypical mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job. Lindner testified that he distributed copies of his mud displacement plan to BP, Transocean and others on the drilling vessel; thus Transocean and others were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

## G.  Abandonment Continued Despite The Failure Of Key Pressure Tests

Two types of pressure tests are used to confirm the integrity of a well. The integrity of the casing pipes and assembly is assessed with a "positive pressure" test,

which involves increasing pressure in the casing string and observing the pressure response. If the increase in pressure bleeds off, it indicates a problem with the pressure integrity of the casing: the pumped-in pressure is escaping through a leak somewhere along the line. However, if the increased pressure stays constant, it does not necessarily mean the casing assembly is secure – the external pressure from the hydrocarbons around the well can be sufficient to maintain the increased pressure reading in the casing string even if there is a breach. Thus, a negative result (where the pressure leaks off) is useful because it is clear evidence of a leaky casing string. But a positive result (where the pressure remains constant), does not prove a secure casing string.

On April 20, 2010, the Macondo well had a positive result to its positive pressure test, which neither confirmed nor denied the integrity of its casing string. At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to M-I's mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

The BOP's annular preventer was closed to seal the casing string for the negative test. However, for some reason it did not form a secure seal. Instead, about 50 barrels of spacer fluid was allowed to leak through the BOP and into the well. Accordingly, dense, viscous spacer fluid was allowed into the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets. BP and Transocean were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

The negative pressure tests were intended to assess the security of the cement job at the bottom of the Macondo well.  With the casing string sealed, pressure was bled off from inside the well, "under balancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself.  If the cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flowing out of the well and the pressure in the casing would remain at the reduced, underbalanced level.  An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and re-pressurize the casing string.

BP's and Transocean's two negative pressure tests on the Macondo well both yielded abnormal results.  In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state.  In the other test, the pressure in the well increased from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that the cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs.  The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well and re-pressurizing it after it had been underbalanced for the negative pressure test.  The pressure tests themselves may have further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

BP's interpretation of the pressure tests was also not industry standard.  BP admitted to Congressional investigators that continuing work on the well after such alarming test results may have been a fundamental mistake.  In May 2010, BP admitted that these pressure test

results were clear warning signs of a big abnormality in the well.

Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the Deepwater Horizon, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established.  Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure.  The well site leader should have called experts on the drilling vessel or on shore to discuss the results.

In its November 16, 2010 interim report, the NAE panel wrote that "it is clear that pressure build-up or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well.  At Macondo, there was both pressure build-up to 1400 psi and unexpected flow out of the well during the negative pressure tests.

There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct the obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs.  BP and Transocean, however, elected to ignore the red flag results of the only cement integrity tests they had performed, and continued instead with their well completion plan as if the cement job had been a success.

### H.  An Unorthodox Spacer Fluid Process Interfered With Pressure Tests and BOP Functionality

During the mud displacement process, BP used an unconventional fluid mixture – and an unusually large volume of it – as "spacer" fluid.  This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or

clogging in the BOP.

In oil wells, a "spacer" is a fluid used to create a division between two other fluids, with the spacer fluid physically preventing the two other fluids from coming into contact and mixing with or contaminating one another.  In the mud displacement process at Macondo, the spacer was intended to separate the synthetic drilling mud from the seawater displacing it.

Spacer fluid is usually water-based mud, but according to testimony from M-I drilling fluid specialist Leo Lindner, an uncommon mixture of fluids was used as spacer during the Macondo well's mud displacement process.  Instead of mixing a batch of the usual water-based mud spacer fluid, Lindner combined two "pills" of lost circulation material ("LCM") that had been previously prepared for use in the event of any fluid loss during the cementing job.  Unlike the water-based mud typically used as spacer, LCM pills are highly viscous fluid that coagulates to create an extremely thick, stringy mass intended to fill the lost circulation zone, clogging fractures in the rock so that other drilling fluids can no longer escape into the formation.  Lindner testified that it was "not common" to use LCM as a spacer, and that he had never done so before, but that BP and Transocean employees on the Deepwater Horizon were aware of the unorthodox LCM-based spacer and both had either approved the use or allowed it to occur without comment.

In addition to the atypical composition of spacer used in the Macondo well, the volume of the fluid used was also nonstandard.  Lindner testified that normally a spacer is around 200 barrels of fluid, but in the Macondo well, the two LCM pills that were used as spacer had a combined volume of 450 barrels – over twice as large.

Upon information and belief, BP and Transocean used this aberrant fluid composition and volume as spacer in the Macondo well solely to skirt environmental regulations that would

23

have required more costly and time-consuming hazardous waste disposal procedures for the two unused LCM pills.

As discussed above, the LCM used as a spacer leaked past the annular preventer through the BOP and into the well before the negative pressure test was run. BP's and Transocean's unusual use of LCM as spacer fluid could have confounded the negative pressure test results by blocking the small-bore pipes used for the tests, and could have negatively affected the functionality and effectiveness of the BOP itself.

## I.   BP and Transocean Ignored Or Overlooked Warning Signs

Constantly monitoring a well for signs of hydrocarbon influx is vital for well safety. It is common practice in the industry for employees of several companies on a drilling vessel – the mud-logging company, the drilling contractor, and the lease operator – to focus on it and be ready to take immediate remedial action.

After the litany of short-cut operational decisions BP and Transocean made to save time and money completing the Macondo well, they should have been especially tuned into any signs of trouble. But instead of the requisite vigilance, BP and Transocean had become complacent in their haste to complete operations at Macondo. As a result, BP and Transocean failed to properly monitor the well and ignored or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

Pressure and flow data from the well in the two hours before the blowout should have put BP and Transocean on notice that there was a problem and that hydrocarbons were leaking into the well. Post-spill review of the real-time data available on the Deepwater Horizon on April 20, 2010, showed that the first indications of hydrocarbons flowing into the well started at 8:52 p.m., and went unnoticed by BP and Transocean. Post-spill modeling indicated that

24

by 9:08 p.m., 39 barrels of hydrocarbons had leaked into the well, but BP and Transocean still had not noticed the pressure and flow indications of the influx.  It was not until 9:41 p.m. – four minutes before the blowout – that BP and Transocean finally noticed that the well was rapidly filling with hydrocarbons and that immediate well control action was needed.

At 8:52 p.m., the pumps displacing the heavy mud with seawater were slowed, but instead of flow out of the well decreasing accordingly, as it should have, flow increased — a clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in.  Yet BP and Transocean appear to have completely ignored this first red flag and simply carried on with the mud displacement process.

From 9:08 p.m. to 9:30 p.m. on the night of the blowout, when the mud displacement pump was either running at constant flow or was shut off, pressure in the well steadily increased.  Modeling data from BP's investigation of the disaster showed that at this point, hydrocarbons were flowing into the well at about nine barrels per minute.  This pressure data also should have caused BP and Transocean to start well-kill operations to restore control over the pressure.  Instead, the increasing pressure was ignored or overlooked.

The mud displacement pumps were shut-down completely at around 9:30 p.m.  By then, hydrocarbons had been continuously flowing into the well for 38 minutes.  Modeling data from BP's disaster investigation showed that about 300 barrels of hydrocarbons had flowed into the well by this time.   A few minutes later, at 9:38 p.m., the steadily increasing level of hydrocarbons passed through the wide-open BOP into the riser.

Although there may have been some discussion of "differential pressure" in the well once the mud displacement pumps were turned off, there is no other evidence that Drilling

Defendants noticed or properly interpreted the many warning signs of the imminent blowout until drilling mud began to spill out of the riser onto the vessel deck at 9:41 p.m., just four minutes before the blowout.

Inexperience may also have affected the choices and competency of the Deepwater Horizon workers during these critical hours. In BP's chain of command for Macondo operations, five employees had less than five months in their respective positions. BP's well site leader had mostly land-based drilling experience, and admitted he was working on the Deepwater Horizon to learn about deep water. BP also complained to Transocean that turnover on the drilling vessel had been high, including the replacement of experienced drillers with new hires. BP understood that further dilution of experienced personnel may be detrimental to the performance of the rig.

Investigators for the safety review commissioned by Transocean prior to the Spill found that a lack of hands-on experience for Transocean workers and managers contributed to safety concerns. Transocean recognized that many workers were readily promoted without sufficient on-the-job experience to fully appreciate the risks. Moreover, the Deepwater Horizon Study Group found no evidence that any of the drilling vessel workers or onshore employees directly involved with the Macondo well had formal training or qualifications in risk assessment and management of complex systems such as were found aboard the Deepwater Horizon.

In addition to carelessness, nonchalance, or inexperience causing them to ignore or overlook the warning signs of a blowout, it is also possible that drilling vessel workers, pushed by BP and Transocean to work faster and combine multiple tasks during these final completion operations, were too distracted to properly monitor the well and to notice the alarming signs of imbalance.

As hydrocarbons were steadily filling the well and mounting towards the riser, vessel workers' attention was split between mud displacement and other simultaneous tasks such as (1) the sheen test, (2) preparations for the upcoming cement plug insertion, (3) the investigation of a problem that had arisen with one of the mud pumps, and (4) the entertainment of BP and Transocean executives ironically onboard to celebrate the Deepwater Horizon's supposedly spotless safety record.

Several of these simultaneously occurring activities distracted vessel workers from responsibly monitoring pit fluid levels, eliminating that important source of well flow monitoring information. A few hours after the mud displacement process began at noon, BP and Transocean began a four-hour offload of mud to the nearby supply vessel M/V Damon Bankston. In addition, some of the mud pits and the trip tanks were being cleaned and emptied during the course of the afternoon. Each of these activities affected the pit fluid levels, compromising their usefulness as indications of well flow. There is no evidence that BP and Transocean had any reason to perform these activities during the mud displacement process other than time savings.

Even if there had been a compelling reason to perform the mud offload and pit cleaning activities simultaneously with the mud displacement process, BP and Transocean could have preserved the useful monitoring function of pit fluid level information by isolating one or more of the pits for well flow monitoring. At the very least, BP and Transocean could have begun monitoring pit fluid levels again at 5:17 p.m., once the mud offload task was complete. There is no evidence that pit fluid levels were ever monitored again that afternoon or evening.

The multiple distractions and interference with well data caused by the drilling vessel crew's multitasking left them unable to "detect, analyze, and effectively react to the developing

blowout," according to the Deepwater Horizon Study Group. The Group also noted that "perils of parallel processing" have contributed to past oil and gas disasters such as the Piper Alpha blowout in the North Sea, and the Exxon Valdez crash. The Deepwater Horizon's crew performance of simultaneous tasks fractured their attention at critical times, with catastrophic results.

### J.   Attempts at Well Control Were Too Late

While the Deepwater Horizon's crew was inattentively working, hydrocarbons flowed into the well through the bottom of the last section of casing pipe, flowing up the casing string, and through the BOP and riser to the surface. Because of their inattention to proper well monitoring during the mud displacement process, the first sign of this hydrocarbon influx BP and Transocean seemed to notice was the mud that began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

For emergencies like this one, BP's and Transocean's policies and instructions regarding well control procedures for their vessel workers were woefully inadequate. The procedures only contemplated relatively small influxes into the well, and did not provide guidance on what to do if the initial procedures failed to stop the influx, or whether and when to activate emergency BOP functions such as the emergency disconnect system.

In response to the mud spurting out of the riser at 9:41 p.m., the drilling vessel crew diverted flow from the well into the mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air. This diversion would have been the correct protocol if this incident had been a mere kick. But for a blowout caused by hundreds of barrels of hydrocarbons blasting out of the well, the decision to divert well flow through the mud-gas separator only exacerbated the disaster.

Diversion to the mud-gas separator not only contributed to the explosions on the Deepwater Horizon, but it likely caused them to happen sooner than they might have if well flow had been directed overboard instead. The gas venting pipes on the Deepwater Horizon's mud-gas separator were goose-necked, which meant they directed the vented gas downwards towards the vessel. When large volumes of gas began to escape out of the Macondo well, the goose necked vents in turn spread gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.

The volume and pressure of the gas rushing out of the well eventually overwhelmed the mud-gas separator entirely, bursting its seals, and allowing the gas to spread directly under the vessel deck as well, enveloping the Deepwater Horizon in a highly flammable cloud of gas.

The blowout became worse as the high pressure gas flow caused the failure of surface equipment on the drilling vessel, most of which was rated to withstand only 60 – 100 psi. As each of these seals and systems gave way under the immense pressure, additional flow paths were opened and the blowout gained strength.

The drilling vessel workers, following Transocean's insufficient well shut-in protocol, closed two of the BOP's non-shearing rams, which eventually sealed around the drill pipe at 9:47 p.m. At this point, all flow paths from the well to the drilling vessel were sealed off except for the drill pipe. Flow up the drill pipe was prevented by pressure in that pipe. With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded.

### K.   Faulty Vessel Safety Equipment Exacerbated the Blowout

The initial explosion on the Deepwater Horizon on the night of April 20, 2010, was likely caused by an engine on the vessel deck that sucked in the gas blasting down on the decks

from the mud-gas separator vents.  Gas sensors, designed to shut-down vessel engines when dangerous vapors are present, are critical to preventing explosions in such situations.  Yet the gas sensors – and the emergency engine shutdown systems connected to them – were apparently not operational aboard the Deepwater Horizon on the night of the blowout. Moreover, the automated feature that should have closed the engine's air intake valves upon sensing gas entering the engine room also failed.  Moreover, the Deepwater Horizon's engine room was not equipped with a gas alarm system that could have shut off the power.   The installation and maintenance of these sensors, alarms, and emergency shutdown systems on the Deepwater Horizon were the responsibility of Transocean, the vessel's owner.

At approximately 9:48 p.m., the gas sucked into one of the Deepwater Horizon's engines caused it to begin to over-speed.  The vessel lost power less than a minute later, almost immediately followed by two explosions, which ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well.  BP's investigators found potential flow paths through the mud pumps and through the top of the drill string, as well as the possibility that movement of the drill pipe broke the seal that the BOP rams had made around the drill pipe, reopening the direct flow path from the casing into the riser.  Through all or some of these flow paths, gaseous hydrocarbons poured onto the vessel, fueling fire that engulfed the Deepwater Horizon and ultimately killed 11 crew members, injured 17 others, and destroyed the vessel.

### 1.   The Failure of the BOP

Immediately after the explosion, vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's BOP.  Problems and failures with each of the

BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and squelching the blowout.

The BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence ("EDS"), the automatic mode function ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or auto-shear functions. None of these were able to activate the BOP to seal the well.

The explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS. From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor. On the vessel, these multiplex cables were not protected against explosions or fire. It is likely that these cables were damaged during or immediately after the first explosion, effectively disabling the vessel workers' ability to communicate with the BOP.

The AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP, circumstances that were certainly satisfied once the multiplex cables and the also-unprotected hydraulic conduit hose on the Deepwater Horizon were damaged by the explosions and/or fire. But poor maintenance of the BOP itself prevented the completion of the AMF sequence to close the blind shear ram.

The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality, but Transocean's shoddy BOP maintenance prevented either of the two pods from completing

the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a faulty solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. These problems apparently existed prior to April 20, 2010, and were significant enough to prevent either control pod from completing the AMF sequence to close the BOP's blind shear ram.

BOP maintenance was Transocean's responsibility, but BP was aware of Transocean's infrequent and inadequate maintenance of the device. The faulty solenoid valve on one of the control pods would have shown up on the BOP control diagnostic system on board the drilling vessel, which was accessible to all and should have alerted BP and Transocean to the problem.

Transocean's BOP maintenance records from 2001 to 2010, which were also available to BP at all times, indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement. Unlike the solenoid valve failure, the BOP's diagnostic function would not have shown a low battery charge, all the more reason for Transocean to proactively change the batteries frequently to avoid failure. But, as BP knew, Transocean had neglected the BOP batteries before. For example, a November 2007 activity report recorded that when the BOP was brought to the surface, all of the batteries in one of the pods were dead.

Beyond these specific BOP maintenance issues, BP and Transocean were also aware that during the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's manufacturer required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to the manufacturer for inspection since 2000.

The BOP had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection. According to Transocean maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid. An independent engineering company was hired to assess the BOP, but could not perform all of its examinations – including verification that the Deepwater Horizon's BOP could effectively shear drill pipe and seal off wells in high pressure, deep water conditions – because the BOP was in use and inaccessible on the sea floor, and BP and Transocean would not stop work to bring it up.

A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves. In keeping with its lax approach to BOP maintenance, Transocean also failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.

BP later noted that Transocean did not record well control related equipment maintenance – including that of the BOP – accurately or completely in its regular maintenance management system. BP also recognized that some alleged work that was recorded as performed on the BOP could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

After the explosions, as the Deepwater Horizon was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram

using the "hot stab" or auto-shear functions. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP. BP and Transocean were aware of at least two, and maybe all, of these leaks prior to April 20, 2010. One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by BP or Transocean. In any event, the weekly BOP function tests should have made BP and Transocean aware of the other hydraulic system leaks identified during the ROV intervention.

BP and Transocean were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, BP and Transocean had switched out one of the Deepwater Horizon's variable bore rams with a non-functional test ram. After the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because BP and Transocean had not updated the BOP's schematic diagram to reflect the aftermarket changes. BP's and Transocean's failure violated 29 C.F.R. § 1910.119, which required up-to-date process and safety system equipment drawings as a part of basic process safety management.

BP and Transocean officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010; however, no action was ever taken to address the

34

problems, perhaps because additional delays and costs would accrue as all well work would stop while the BOP was raised from the sea floor for repairs. In addition to posing a significant safety risk, BP's and Transocean's choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

Despite vessel workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well. Although tests determined that the ROVs had activated the high-pressure blind shear ram close function by cutting the auto-shear rod, the well continued to spew oil into the Gulf of Mexico.

At the time of the disaster, BP and Transocean were certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. BP and Transocean were also aware that the industry and government had significant concerns about the reliability of BOPs like the one installed on the Deepwater Horizon. A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 74 vessels studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.

Despite being aware of the risk of the BOP failing at greater depths, BP and Transocean did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

The Deepwater Horizon's BOP was outfitted with only one blind shear ram. But blind

shear rams are vulnerable to a "single-point failure" – if just one of the small shuttle valves that carry hydraulic fluid to the ram malfunctions, the BOP cannot seal the well. A 2000 report on the Deepwater Horizon's BOP concluded that the shuttle valve was the BOP's weak spot. Consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve. Indeed, evidence suggests that when the Deepwater Horizon crew attempted to activate the BOP's blind shear ram, the ram's blades could not cut through the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

Vulnerabilities like the BOP blind shear ram's single-point failure risk were well understood by BP, Transocean and the rest of the oil industry. In fact, offshore drillers now commonly add an extra layer of protection against this single-point failure risk by equipping their BOPs with two blind shear rams. In 2001, when the Deepwater Horizon went into service, Transocean was already equipping its newer drilling vessels with BOPs that could accommodate two blind shear rams, and today 11 of Transocean's 14 Gulf of Mexico vessels have two blind shear rams. The three that do not were built before the Deepwater Horizon. Nevertheless, neither Transocean nor BP retrofitted the Deepwater Horizon's BOP with two blind shear rams. BP's explanation was that the drilling vessel needed to carry the BOP from well to well and there were space limitations. However, oil industry experts have dismissed that explanation, saying an additional blind shear ram on the BOP would not necessarily have taken up any more space on the vessel.

BP and Transocean were also well aware of the benefits of redundant blind shear rams. In May 2003 the Discoverer Enterprise – a Transocean vessel operated by BP, just like the Deepwater Horizon – was rocked when the riser pipe connecting the vessel to the wellhead cracked open in two places. The BOP was activated and the first blind shear ram closed. After

robots checking the integrity of the BOP noticed damage, the second blind shear ram was also closed to provide an extra layer of protection against a blowout. Despite this firsthand experience of the necessity of redundant blind shear rams, BP and Transocean used one of the slots on the BOP for the non-functional test ram, which would save them money by reducing the time it took to conduct certain well tests, instead of installing a second blind shear ram there. BP and Transocean have acknowledged their awareness that installing the test ram instead of a functional ram would reduce the built-in redundancy and raise the risk profile of the Deepwater Horizon.

If the BOP on the Macondo wellhead had been functional and properly maintained by Transocean, it could have been manually or automatically activated right after the explosion, stopping the blowout at the wellhead, limiting the Spill to a minute fraction of its ultimate severity, and thereby sparing Plaintiffs millions of dollars in losses and damage.

BP and Transocean failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

BP and Transocean also failed to ensure that the Deepwater Horizon's BOP had sufficient, functional, built in redundancy to eliminate single-point failure modes.

BP and Transocean also failed to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut-down and the well secured.

BP and Transocean also failed to ensure that the testing, if any, of the Deepwater Horizon's BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF and/or auto-shear.

BP and Transocean could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deep water drilling was present and available on the Deepwater Horizon, but did not do so.

BP and Transocean could have installed a back-up acoustic trigger to activate the Deepwater Horizon's BOP in the event that the main trigger failed to activate. In fact, federal regulators at the MMS communicated to BP and/or Transocean in 2000 that MMS considered a backup BOP activation system to be an essential component of a deep water drilling system.

Despite this notice, and although the back-up acoustic BOP trigger is a common drilling vessel requirement in other oil-producing nations, including other areas where BP and Transocean operate, the Deepwater Horizon was not equipped with this back-up acoustic BOP trigger.

## 2.   Poor Vessel Maintenance and Reckless Bypass Of Safety Systems

Unfortunately, the BOP was not the only part of the Deepwater Horizon that was poorly maintained and in disrepair at the time of the blowout. Transocean had a history of postponing and ignoring needed maintenance on the Deepwater Horizon, despite concerns raised by its own employees and other vessel workers. In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer glitches, and a failed or failing propulsion system. In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. When the Macondo well blew out, the Deepwater Horizon's shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

Apparently, the Deepwater Horizon had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that

should have powered safety and shutdown devices immediately after the blowout.   Vessel-wide electrical failures had occurred two or three times before April 20, 2010, and the driller's control chair had lost power just a few days prior to the blowout.   The primary computer used to control all vessel drilling functions routinely crashed and had to be restarted, interfering with vessel workers' ability to monitor well data.   One of the vessel's thrusters, an underwater propeller that helps the floating vessel move and stabilize itself in the water, had been having problems for eight months prior to the blowout.

Moreover, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.   Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

Even worse, some key safety systems and alarms on the Deepwater Horizon had been intentionally bypassed or disabled by Transocean.  For example, on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in bypass mode when the gaseous hydrocarbons blew out of the Macondo well.  A fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year.  The system was set to "inhibited" mode, meaning that the control panel would indicate a problem, but a general alarm would not sound throughout the vessel unless manually activated.  These problems had been brought to the attention of BP and Transocean numerous times, including complaints made just days prior to the blowout.

Upon information and belief, had Transocean not disabled the alarm systems, the

system would have sounded alarms immediately after the blowout, shut-down all potential ignition sources, and activated the drilling vessel's EDS, which would have prevented the explosion.

When the Deepwater Horizon lost power during the blowout, none of the backup or emergency generators were working – equipment that was on board for the very purpose of providing power to alarm and safety systems in just such an emergency.  There was no general alarm, no internal communications, and no power to the vessel's engines.  Moreover, without power, the crew was also unable to engage the EDS that would have stopped the flow of gas fueling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."  The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

The findings of the Transocean-commissioned equipment assessment echoed a similar BP-commissioned audit that had been conducted in September 2009.  The BP audit found that Transocean had excessive overdue planned maintenance, consisting of 390 jobs amounting to 3,545 man hours of needed maintenance work.

In a confidential worker survey conducted on the Deepwater Horizon just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs. Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs.

BP was aware of Transocean's poor maintenance of the Deepwater Horizon and its practice of disabling or bypassing vital safety systems, and alarms, yet it never called for work to stop until vessel safety was improved, and it never reported Transocean's actions and inactions to the MMS.

### L.  BP's and Transocean's Culture of Complacency

All the evidence of BP's and Transocean's misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon described above is part of a culture of complacency. BP and Transocean did not take the serious risks seriously, and failed to identify or respond to the risks that proved to be fatal. The complacency was especially deplorable considering that – on March 8, 2010 – the Deepwater Horizon had just survived a near miss, an influx that went unnoticed for over 30 minutes. That brush with disaster should have been a lesson learned for BP and Transocean, but to the contrary, just six weeks later, their haste and carelessness again led them to miss signs of an influx for 49 minutes, and to not notice the breach until it was too late.

An independent group of scientists singled out BP in particular for its "lack of discipline" in its operations at Macondo, in an interim report released November 17, 2010. "Numerous decisions to proceed toward abandonment [well completion] despite indications of hazard, such as the results of repeated negative pressure tests, suggest an

insufficient consideration of risk and a lack of operating discipline," according to the 15-member panel of National Academy of Engineering scientists.

Moreover, the panel found that BP suffered from a lack of "management discipline" and problems with "delegation of decision making" on board the Deepwater Horizon. Workers aboard the drilling vessel were often unsure about who was actually in charge, and there was a "lack of on board expertise and of clearly defined responsibilities," the NAE report said. Poor communication between employees of BP and Transocean also contributed to the confusion on the vessel.

As the Deepwater Horizon Study Group put it: "[i]t is the underlying 'unconscious mind' that governs the actions of an organization and its personnel." In the case of the Deepwater Horizon, the cultural influences permeating the Macondo teams – both on the vessel and on the beach – reflected "gross imbalances between production and protection incentives" and manifested in "actions reflective of complacency, excessive risk-taking, and a loss of situational awareness."

BP's and Transocean's complacent approach to their respective responsibilities regarding the Deepwater Horizon Macondo well was in direct violation of federal regulations intended to maintain public safety. Pursuant to 33 C.F.R. 250.107, BP and Transocean were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition. They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations. BP's and Transocean's violation of these regulatory mandates caused and/or

42

contributed to the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill.

This culture of carelessness and impudence was not limited to BP's and Transocean's actions and decisions on the Deepwater Horizon at the Macondo well.   In fact, BP and Transocean have a history of foolhardy, irresponsible behavior across their operations on land and at sea – a record littered with accidents, spills, regulatory violations, fines, and lawsuits.

Workers on the Deepwater Horizon also described "a corporate culture of ...ignoring warning signs ahead of the [April 20th] blast," saying that "BP routinely cut corners and pushed ahead despite concerns about safety."  Prior incidents, investigations and testimony from Congressional hearings show that BP actively discourages workers from reporting safety and environmental problems.   Reports from multiple investigations of the Texas City and Alaska disasters all indicate a pattern of intimidating – and sometimes firing – workers who raise safety or environmental concerns. In Alaska, pressure for increased production with fewer safety reports created "an environment where fear of retaliation [for reporting problems] and intimidation did occur."   Also in Alaska, a pipeline safety technician working for a BP contractor was scolded, harassed, and ultimately fired for reporting a crack in a pipe that was dangerously close to an ignition source, despite that other reports indicated he was one of the top-performing employees in his position.  "They say it's your duty to come forward," he said of BP's official corporate policies, "but then when you do come forward, they screw you." In a more extreme example, in the 1990s a BP executive was involved in a scandalous scheme involving spies hired to track down a whistleblower who had leaked information about BP spills to the press.

When Tony Hayward took office as CEO of BP p.l.c. in 2007, he pledged to

change BP's culture with a renewed commitment to safety.   Yet according to the Occupational Safety and Health Administration ("OSHA"), over the past three years – during which time BP was under Mr. Hayward's leadership – BP has committed 872 safety violations – – most categorized by OSHA as "egregious willful" – a number made even more shocking when compared to BP's competitors, who average about five violations each.   Two refineries owned by BP account for 97 percent of all "flagrant" violations found in the refining industry by government safety inspectors over the last three years.   According to a former EPA lawyer involved in the Spill investigations, "none of the other supermajors have an environmental criminal record like they do."   BP's marginal ethics are well known to its competitors and others in the oil and gas industry, yet other companies – including Transocean – continue to work with BP closely and frequently.

Like BP, Transocean's corporate culture is also skewed towards profits at the expense of safety, according to the results of the broad review of its North American operations made before the blowout.   Transocean's system for tracking health and safety issues on the Deepwater Horizon was "counter-productive," according to nearly all the workers surveyed. Fake data entered into the program in order to circumvent it distorted the perception it gave of safety on the vessel. Moreover, Transocean's entire fleet of drilling vessels bypassed certain vital safety systems as a matter of practice.

Investigators also found that a stifling bureaucracy imposed by onshore management bred resentment among Transocean vessel workers.   Workers complained that past problems were only investigated by the company in order to place blame, rather than to learn from the mistakes. Although workers often saw unsafe behavior at the rig many expressed fears of reprisals for reporting problems, especially to supervisors based in Houston. This tension

between the vessel and the beach likely played a role in discouraging workers on Deepwater Horizon from reporting problems or anomalies like the abnormal negative pressure results to their supervisors onshore.

As BP and Transocean internally prioritize profits over safety at every level of their companies, they continue to resist and evade regulation of the oil exploration and production industry. For example, despite the known vulnerabilities and shortcomings of BOPs in deep water drilling, this year BP helped finance a study to support their argument that BOP pressure tests should be required with less frequency – every 35 days rather than the current frequency of every 14 days. This change would save the industry $193 million per year in "lost productivity." BP has also actively opposed MMS rules requiring drilling vessel lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon disaster is a tragic example to the contrary.

Decisions tradeoffs, actions, and inactions by BP and Transocean, including the risky well design, inadequately tested cement, tests that were skipped or misinterpreted, and procedures that deviated from industry norms, all contributed to the blowout of the Macondo well. At no time did BP or Transocean report regulatory violations to the authorities, or call to stop work because of unsafe decisions, plans, actions, or conditions in the well or on the vessel. The carelessness, nonchalance, inexperience, and distraction of BP and Transocean resulted in insufficient well monitoring and overlooking the signs of an influx for 49 minutes prior to the blowout. Once the well blew out, BP's and Transocean's poor vessel maintenance and intentional bypass of alarms and emergency systems contributed to the failure of safety mechanisms, exacerbated the disaster, and likely caused the unnecessary deaths and injuries of

vessel workers, the destruction of the Deepwater Horizon and the Spill that damaged Plaintiffs. Underlying it all, BP's and Transocean's corporate cultures of trading safety for speed, production, and profit, and encouraging their employees to do the same, sped the inevitable approach of catastrophe.

**M.  BP Misrepresented The Severity Of The Spill And Its Response Capabilities**

On the night of April 20, after the explosions ignited the vessel, the resulting fire on the Deepwater Horizon raged for two days before the vessel finally sank on April 22, 2010.  On the sea surface, the Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe.  As the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  Immediately, oil and natural gas began to escape from the open end of the riser and from at least two places along its twisted length.

For 87 days, the surge of oil and gas from the gushing well continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone as it was driven landward by currents and winds.  Once the oil reached the coasts, it damaged the pristine beaches and delicate wetlands, marshes, and estuaries that line the coasts of the Gulf States, destroying the habitats and spawning sites of marine life, as well as the tourism industry and property values in the Coastal Zone.

From the outset, BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day.  An internal BP document release later showed that the company's analysis at that time actually determined that the rate of oil spillage could be as high as 100,000 barrels – or 4,200,000 gallons – per day.

BP may have understated the Spill size because certain pollution-related fines against BP will ultimately be calculated based on the volume of oil and other pollutants spilled.

BP's obstructionist behavior regarding accurate data continued as the Spill progressed; BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill, and resisted scientists' efforts to gauge the scope of the disaster on land and at sea.

While BP was understating the severity of the Spill, it became clear that BP had previously overstated its ability to respond to a spill. In its initial EP, submitted prior to beginning work at Macondo, BP had assured the MMS that it could effectively contain any spill of up to 250,000 barrels of oil per day, using proven equipment and technology. In reality, BP was not prepared for an oil spill of any size. The spill-prevention plan BP had submitted to the MMS was an obvious cut-and-paste job that had not been updated to current conditions – not only did it reference Arctic wildlife not indigenous to the Gulf of Mexico, such as walrus, it also listed incorrect and out-of-date contact information for oil spill engineers and experts, including one wildlife expert who died in 2006.

BP has now admitted that it did not actually have a response plan with proven equipment and technology in place to contain the Deepwater Horizon Spill and that its contingency plans were inadequate. Despite the constant risk of a spill at any one of its many Gulf of Mexico wells, BP did not have a realistic response plan, a containment barge, skimming vessels, a response crew, or recovery material like containment boom ready and available to deploy immediately in an emergency. On the contrary, the Spill response could not begin until the U.S. government, including the Coast Guard and the Navy, brought in skimmers, boom, and other materials, and volunteers were found to assist with the clean-up.

On May 17, 2010, several U.S. Senators contacted U.S. Attorney General Eric Holder to request that the U.S. Department of Justice "open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico," noting:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was "proven equipment and technology" to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

Upon information and belief, BP also hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners – the Anadarko Defendants and MOEX Offshore – chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP, along with its lease partners, hoped to retap the Macondo well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.

**N. The Spill's Impact on Plaintiffs**

Because of the Spill, roughly 6.9 million barrels of oil were discharged into the Gulf of Mexico, plus millions of gallons of chemical dispersants and other toxic pollutants. The oil, natural gas, chemical dispersants and other toxic pollutants have contaminated and continue to contaminate the Gulf of Mexico and the Coastal Zone.

The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40

C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

Moreover, the chemical dispersants used by BP during the Spill response may be harmful to the health of humans and marine life. Over two million gallons of chemical dispersants were released into Gulf waters to disperse the oil coming from the damaged well. According to environmental experts in the Deepwater Horizon Study Group, oil recovery (such as skimming) is preferable to chemical dispersion because recovery actually removes the oil from the environment, rather than simply spreading it through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the Gulf ecosystem – even if it is no longer causing public relations damage to BP. The environmental effects of using chemical dispersants in such magnitude and at such depths have never been tested.

The Spill and the resulting contamination of the Gulf of Mexico and the Coastal Zone impacted and continues to impact Plaintiffs' abilities to collect and consume natural resources from the Gulf of Mexico and from the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and other waters of the Coastal Zone. Among other damage, the Spill and the resulting contamination of the Gulf of Mexico and the Coastal Zone caused and continues to cause subsistence losses to Plaintiffs in that they rely on the marine life in the Gulf of Mexico

and the Coastal Zone for food and bait to catch food. The marine life relied on by the Plaintiffs for food include, but may not be limited to, a wide variety of various types and species of fish, crabs, oysters and/or shrimp.

The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico – up to 88,552 square miles at the restriction's greatest extent. According to NOAA, surface-oriented marine life was most harmed by the early stages of the Spill, especially near-shore species and/or species that were spawning when the oil reached the shore. But as the crude oil weathered, sank, or was dispersed throughout the water column, reef and bottom-oriented fish (such as snappers and groupers) were also threatened. In November and December 2010, scientists found evidence that thick swaths of sunken oil bearing the unique hydrocarbon signature of the Macondo well are covering large areas of the seafloor in the Gulf, killing deep water coral reefs and sediment-dwelling organisms that play major roles at the base of the Gulf food chain. Moreover, as sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

Because of the size and nature of the surface oil slick, the subsurface oil plumes, and weathered oil on shorelines, and the toxic effects of the oil and other substances released during the Spill on humans, marine life, and the Coastal Zone environment, there have been and will continue to be further economic losses and diminution of property values to individuals and entities owning and/or leasing residential or investment properties in the Coastal Zone.

Because investigations are ongoing, there are many other potential effects from the

Spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint after additional information becomes available.

**CLAIM FOR
RELIEF**

**The Oil Pollution Act**
**(Against All Defendants)**

Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

The OPA imposes liability on a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

The Coast Guard has named BP as the responsible party for the subsurface release of oil resulting from the Spill and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

The United States District Court for the Southern District of Texas named Anadarko as a responsible party for the subsurface release of oil resulting from the Spill. Therefore, Anadarko is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

The Anadarko E&P and MOEX Offshore held a leasehold interest in the Macondo lease before and/or at the time of the Spill. Therefore, Anadarko E&P and MOEX Offshore are also responsible parties pursuant to Section 2701 (16) and (32) of the OPA. As such, they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

As a result of the Spill, Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover jointly and severally from BP, Transocean, the Anadarko Defendants and MOEX Offshore for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[d]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

To the extent required by law, Plaintiffs have satisfied all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the pre-lawsuit submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

## PRAYER FOR
## RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, individually, jointly

and severally for the following:

    (a)    economic and compensatory damages in amounts to be determined at trial;

    (b)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

    (c)    attorneys' fees and costs of litigation;

    (d)    such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Dated: March 1, 2012

Respectfully submitted,

THE MILLS LAW FIRM

By: _____
    Bradley W. Hoover
    State Bar No. 09965700
    11000 Brittmoore Park Dr., Ste 200
    Houston, TX 77041
    (713) 893-4581
    (888) 313-1507 (Fax)

ATTORNEY-IN-CHARGE
FOR PLAINTIFF

OF COUNSEL:

THE MILLS LAW FIRM
Michael A. ("Mickey") Mills
11000 Brittmoore Park Dr., Ste 200
Houston, TX 77041
(713) 893-4581
(888) 313-1507 (Fax)

# EXHIBIT  A

1. Arnold A. Acosta – Texas
2. Henry E. Adams – Texas
3. John Adamson – Texas
4. Gerry E. Addison – Texas
5. Vera L. Alexander – Texas
6. Abdul M. Ali – Texas
7. Clarence Allen, Sr. – Texas
8. Michael W. Allinder – Mississippi
9. Ralph A. Anderson – Texas
10. Ronald W. Anderson – Texas
11. Mwata Andrews – Texas
12. Steven Andrus – Texas
13. David Atkins – Texas
14. Darryl L. Azore – Texas
15. Jerome J. Babineaux – Texas
16. Dennis Bailey – Texas
17. David Balderaz – Texas
18. Richard Baldini, III – Louisiana
19. Derrick A. Baldwin – Texas
20. Henry L. Banks - Texas
21. Felton Bellard – Texas
22. Donald M. Bench – Texas
23. Larry R. Bennett – Texas
24. Troy R. Berlinger – Texas
25. Keith Berry – Texas
26. Neal E. Bland, Jr. – Texas
27. Michael Bledsoe – Texas
28. David A. Block – Texas
29. Micah Bohon – Texas
30. Earnestine C. Bonds – Texas
31. Kathy D. Boone – Texas
32. Caryn A. Bosse – Texas
33. Charles C. Bracks – Mississippi
34. Jimmie E. Bracks – Mississippi
35. Benny M. Breazeale, Jr. – Mississippi

36. Jerry W. Breda – Texas
37. Yvette L. Breed – Texas
38. Johnny B. Briggs – Orange
39. Reginald Brigham – Texas
40. Christopher Brim – Texas
41. Landon C. Brinkley – Texas
42. Eric B. Britnell – Texas
43. Gary M. Brouillette – Mississippi
44. Bobby R. Brown – Texas
45. Charles Brown – Texas
46. Jeffery Brown – Louisiana
47. Joseph J. Brozak – Texas
48. Duong Q. Bui – Texas
49. Mark W. Burgess – Texas
50. Bennie R. Burson – Texas
51. Roberto Caceres – Texas
52. John C. Calhoun, Jr. - Texas
53. John V. Cappadona – Texas
54. Melchor Cardenas – Texas
55. James Carlin – Louisiana
56. Gregory Carr -- Texas
57. Jacqueline D. Carroll – Texas
58. George Cash, Jr. -- Texas
59. Charles H. Cates – Texas
60. Sokha Chao – Alabama
61. Sheila Chapman – Texas
62. Shalanda M. Chark – Texas
63. Gerald Cheatham – Texas
64. George Chevis – Texas
65. Donald W. Childress -- Texas
66. Jennifer S. Church – Texas
67. Roman Cizek – Louisiana
68. Renne E. Clements – Texas
69. Glenn Click – Texas
70. Billy Clifton – Texas
71. David Coker – Texas
72. Damario D. Cole – Texas
73. Corey L. Coleman – Texas
74. Lee Coleman – Texas
75. Maximo Contreras – Texas

76. Michael A. Cope – Texas
77. Richard A. Corbett – Texas
78. Sipriano Cruz – Texas
79. Eligha Curry – Texas
80. Derrick L. Curvey – Texas
81. Charles L. Dade – Texas
82. Alan Dailey – Texas
83. Michael Damian – Texas
84. Roland Daniels, Jr. – Texas
85. Theresa Davenport – Texas
86. Lillie F. Davidson - Texas
87. Kara M. Dent – Texas
88. Linda G. Dexter (Foty) – Texas
89. Michael F. Diebold – Mississippi
90. Leroy Donley, Jr. – Texas
91. Harold Doty – Texas
92. Dwight J. Duke – Texas
93. Bobby E. Dykes – Mississippi
94. Carey Earl – Texas
95. Arthur East – Texas
96. Donald J. Eatmon – Texas
97. Johnny F. Ellis – Texas
98. Henry L. Ezell – Texas
99. Rodney O. Fairley – Mississippi
100. William J. Feazell, Jr. – Texas
101. John Fennelly – Texas
102. Leroy Ferguson, Jr. – Texas
103. Kyle A. Fickessen – Texas
104. Brent D. Flato – Texas
105. Charles R. Fleming – Texas
106. Michael A. Flora – Texas
107. Joseph Foley – Texas
108. Jack N. Foty – Texas
109. Ruth A. Fouts – Texas
110. David M. Fregia – Texas
111. Frederic A. Frere – Texas
112. Terry L. Fullen – Texas
113. James D. Fuller – Texas
114. Vittorio Galia – Texas
115. Vernon Gallier – Texas

116. Ricardo Galvan – Texas
117. James Garcia – Texas
118. Juan M. Garcia – Texas
119. Rodney Gary, III – Texas
120. Adolfo Garza – Texas
121. Paulino L. Garza – Texas
122. Derrick D. Gaston – Texas
123. Sylvester J. Gayten – Mississippi
124. Garret M. Gibbens – Texas
125. Peter Giglio – Louisiana
126. Howard E. Gilliard – Texas
127. Lawrence Gobert – Texas
128. Kimberly Gonzales – Texas
129. Robert W. Goodrum, Jr. – Texas
130. Christopher S. Gorman – Texas
131. Amile Goudeau – Texas
132. Corey T. Govan – Texas
133. Lionel Green – Texas
134. Eric Green – Texas
135. Michael R. Green – Texas
136. John R. Green – Texas
137. Percy L. Green – Texas
138. Darren R. Grice – Texas
139. Eric A. Grimes – Texas
140. Karen E. Grossenbacher – Louisiana
141. Jace Groth – Texas
142. Clarence Gunter – Texas
143. Wesley D. Haak – Texas
144. Barry Hailey – Texas
145. Elizabeth Hall – Texas
146. Robert Hall – Texas
147. Carl Hallows – Texas
148. Brad J. Hanley – Texas
149. Jim Hardy – Texas
150. Willie O. Harper – Texas
151. Scotty Harris – Texas
152. Richard Harveston – Texas
153. David J. Hebert, Sr. – Louisiana
154. Henrietta N. Heuer – Louisiana
155. Charles E. Hill – Texas

156. Raymond S. Himel, Jr. – Louisiana
157. Erma M. Hite – Texas
158. Christine P. Hoang – Texas
159. Lawrence B. Hodges – Texas
160. Demetrius L. Hollaway – Texas
161. George House, Jr. – Texas
162. Charles N. Howell – Texas
163. Debbie S. Howell – Texas
164. Derek L. Hudspeth – Texas
165. Jimmie L. Hutchings – Texas
166. Phuoc V. Huynh – Texas
167. Eleazar Ibarra – Texas
168. James C. Ivey – Texas
169. Billy R. Jack – Texas
170. Calvin Jackson – Texas
171. Ellen D. Jackson – Texas
172. Joseph T. Jackson – Texas
173. Stanley C. Jackson – Texas
174. Ricky A. Jacobs – Texas
175. Charles W. James – Texas
176. Bill Jamison – Texas
177. Kathy J. Jamison – Texas
178. Keithan Jelks – Texas
179. Arnita Johnson – Texas
180. Lonnie Johnson – Texas
181. Patrick P. Johnson – Texas
182. Joseph L. Jolivette – Texas
183. Louis W. Kadlecek – Texas
184. Martin A. Kain, Jr. – Louisiana
185. Johnie Kinlaw – Texas
186. Ben Lackey, Jr. – Texas
187. Ronald J. Lake – Texas
188. Nguyen Lan – Louisiana
189. Whitney J. Lastrap, Jr. – Texas
190. Nikkie Lea – Texas
191. Joseph L. LeDoux – Texas
192. Juan M. Leija – Texas
193. James W. Livingston – Texas
194. Earl C. Lyman, Jr. – Houston
195. Troy D. Maddox – Texas

196. Walter L. Mallett – Texas
197. Lino L. Martinez, Jr. – Texas
198. Fernando Mata – Texas
199. Adam  B. Nabb – Alabama
200. Lucienne S. Nabb – Alabama
201. Phillip S. Nabb, Jr. – Alabama
202. Mai Thi Nguyen – Texas
203. Trinh V. Nguyen – Florida
204. Vanmony Oeur – Texas
205. William L. O'Neal – Texas
206. Shawn L. Pachlhofer – Texas
207. Harold W. Peavler – Texas
208. Antonio Perez, Jr. – Texas
209. Alphouse Perry-Wiggins – Texas
210. Ronnie E. Porter – Texas
211. Gay N. Rains – Texas
212. Donna L. Rice – Texas
213. Patrick L. Rideaux – Texas
214. Samuel M. Rutherford – Texas
215. Earl Sadberry – Texas
216. Cynthia L. Sensat – Louisiana
217. Sarah Sikes – Texas
218. Nancy B. Tabb – Texas
219. Phillip E. Tabb, Jr. - Texas
220. Barbara L. Turner - Texas
221. Robert Turner – Texas
222. Daniel Uribe – Texas
223. Brittany Vacek – Texas
224. Cody Vacek – Texas
225. Daryl W. Wade – Texas
226. Dale E. Weaver – Texas
227. Anna M. Yarbrough – Texas
228. Mark Yarbrough – Texas
229. Efrain J. Zamudio - Texas

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Patrick Bedford, et al. | BP p.l.c. |

**(b)** County of Residence of First Listed Plaintiff   Harris
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Foreign
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Bradley W. Hoover, The Mills Law Firm, 11000 Brittmoore Park Drive, Ste 200, Houston, TX  77041 (713) 893-4581

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Med. Malpractice | ☐ 625 Drug Related Seizure |    28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 365 Personal Injury - |    of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of Judgment |    Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent |    Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |    Liability |    Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|    Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** |    Safety/Health | | ☐ 490 Cable/Sat TV |
|    (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment |    Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |    Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle |    Property Damage |    Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract |    Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) |    12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | |    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment |    Sentence | ☐ 791 Empl. Ret. Inc. |    or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** |    Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land |    Accommodations | ☐ 530 General | |    26 USC 7609 |    Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | |    Under Equal Access |
| |    Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | |    to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition |    Alien Detainee | | ☐ 950 Constitutionality of |
| |    Other | | ☐ 465 Other Immigration | |    State Statutes |
| | ☐ 440 Other Civil Rights | |    Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
33 U.S.C. 2702, et seq.

Brief description of cause:
Damages for a claim under the Oil Pollution Act of 1990

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE   Carl J. Barbier

DOCKET NUMBER   MDL 2079 (E.D. LA)

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 03/05/2012 | /s/ Bradley W. Hoover |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____